# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

VASHIR J. XIONG, LIA Y. XIONG, and
R. THOR, a minor by his next friends,

                Plaintiffs,

v.

MICHAEL WAGNER, DUTCH LEYDEL,
MARIE FROH, and DANIEL CHIAPPETTA,

                Defendants.

Case No. 11-CV-288-JPS

ORDER

On November 21, 2011, plaintiffs Vashir J. Xiong, Lia Y. Xiong, (collectively, "Xiongs") and R. Thor ("Thor") filed a Motion for Partial Summary Judgment (Docket #31) requesting judgment on two of five claims in their complaint. Defendants Michael Wagner ("Wagner"), Dutch Leydel ("Leydel"), Marie Froh ("Froh"), and Daniel Chiappetta ("Chiappetta") subsequently filed a Motion for Summary Judgment (Docket #32) requesting judgment on all claims. The court will deny the plaintiffs' motion and grant the defendants' motion.

The defendants are employees of the Racine County Human Services Department ("RCHSD") involved to various degrees with a child welfare case involving the Xiongs and the taking of their son Thor into protective custody. Wagner is a caseworker for RCHSD who initiated the original investigation and made the initial decision to place Thor in protective custody. Leydel was Wagner's supervisor at the time. Froh was a caseworker for RCHSD who later worked on the case. Chiappetta was Froh's supervisor. The Xiongs have alleged various civil rights violations in their handling of the child welfare case.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine issue of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

However, where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," there is no genuine dispute as to any material fact because a complete failure of proof "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

1. Facts

The following material facts are undisputed, except as noted. Thor is a minor child who suffers cerebral palsy, global development delay, speech and cognitive impairments, and is wheelchair-bound. (Defs.' Proposed Findings of Fact [hereinafter DPFF] ¶ 1) (Docket #33). Thor has also been known to be difficult and to hit himself. (Shaw Aff. Exs. M, N) (Docket #31-5). On March 23, 2009, the RCHSD received an intake referral from Thor's school stating that he exhibited abnormal bruising on his arm and left side near the hip/leg area. (DPFF ¶ 4).[1] Thor stated he did not remember how he got the bruises, while other reports from teachers noted that Thor had said his mother and stepfather purposefully caused the bruising. (DPFF ¶¶ 4-5).[2]

---

[1] The Xiongs "dispute" a number of the defendants' proposed facts but, where those disputes are in fact merely statements of additional information, not an actual dispute with the proposed fact, the court deems them admitted for purposes of summary judgment. The Xiongs had an opportunity to submit their own proposed facts, and that is the appropriate place to make clear any supposed factual omissions. Proposed findings of fact, and responses, are not the place for argument.

[2] The Xiongs dispute that Thor's statements should be interpreted as having alleged the bruises were caused "purposefully" on the basis that people normally cannot understand what Thor is saying. The Xiongs do not dispute that Thor in fact responded with answers of "mom" and "dad" when asked who caused the bruises. The touchstone, as will be discussed, is not whether the reporting party properly understood Thor, but what information the caseworker had when making the removal decision.

In response, Wagner responded to the referral and began an investigation on March 24, 2009. (DPFF ¶ 6). Wagner spoke with Thor's brother P.Y. at school, who stated that Thor's parents would typically hit Thor as punishment, including the previous Sunday when Vashir Xiong allegedly picked Thor up and threw him onto the floor. (DPFF ¶ 6).[3] P.Y. also stated that his family left Thor alone at home, specifically for Lia Xiong's birthday when the family waited until Thor's evening aide had left, gave Thor some juice, barricaded him in the living room with furniture, and left for dinner. (DPFF ¶ 7).[4] P.Y. also indicated the family would leave Thor home alone when visiting a cousin's house. (DPFF ¶ 8).

Wagner also interviewed Thor at school. (DPFF ¶ 9). Thor, through interpretation, told Wagner that Vashir Xiong caused the bruising on his arm, and that after purposefully kicking his sister, Vashir Xiong either hit or threw him on the floor. (DPFF ¶ 9); (Shaw Aff. Ex. H at 5) (Docket #31-5). Thor also confirmed that he was left home alone on his mother's birthday, as well as times prior. (DPFF ¶ 10). Wagner then interviewed Thor's older sister D.T. at school. (DPFF ¶ 11). D.T. confirmed that Thor was sometimes left home alone and also corroborated P.Y.'s account of how Thor would be left in the

[3]Here, as well as elsewhere, the Xiongs "dispute" this fact by essentially arguing that the statements are from Wagner's notes rather than, presumably, an affidavit from P.Y., and that Wagner in turn wrote his notes "with a slant." The Xiongs offer no evidence to even begin to substantiate that Wagner's notes were written to be purposely misleading. Thus, the court ignores these supposed "disputes" and will refrain from repeatedly pointing this out.

[4]Again, the Xiongs dispute this fact but only by attempting to dispute the accuracy of P.Y.'s statement, not the fact that P.Y. relayed this information to Wagner. Again, the analysis here focuses on the information held by Wagner at the time of decision, not whether the Xiongs in fact acted as P.Y. stated.

living room.  (DPFF ¶ 12).  D.T. also corroborated P.Y.'s statement that this was the case on Lia Xiong's birthday.  (DPFF ¶ 12).

Later in the afternoon on March 24, 2009, Wagner, along with Caledonia Police Officers, visited the Xiongs' home.  (DPFF ¶ 13).  Vashir Xiong confirmed that they had left Thor home alone for approximately two hours the evening of Lia Xiong's birthday.  (DPFF ¶ 14).  He confirmed P.Y.'s and D.T.'s statements regarding the method in which Thor was restricted to the living room while they were gone.  (DPFF ¶ 14).  The Xiongs have testified that as of March 24, 2009, it had not occurred to them anything bad could happen while leaving Thor home alone.  (DPFF ¶ 15).  As a result of the investigation and home visit, Wagner, with the help of officers, took Thor into protective custody and removed him from the Xiong household, placing him in a foster home.  (DPFF ¶ 16).

After Thor's original removal on March 24, 2009, a state judge issued a probable cause order for Thor's temporary removal on March 26, 2009.  (DPFF ¶¶ 25-29).  In the intervening time, Lia and Vashir Xiong gave videotaped interviews in which they stated they had previously left Thor home alone approximately two or three times, possibly four, between January 1, 2009 and March 24, 2009.  (DPFF ¶¶ 17-19).[5]  Subsequently, on March 25, 2009, Dr. George Milonas examined Thor's bruises.  (DPFF ¶ 24). Dr. Milonas could not determine the cause of the bruising to a degree of

---

[5]Despite the Xiongs' protestations that they were essentially misunderstood in these interviews, they were conducted by police officers and relied upon by RCHSD; again, as discussed later, it is not important whether the information supposedly provided by the Xiongs was correct, but whether, on the basis of the police reports, a reasonable caseworker could have believed that probable cause or reasonable suspicion still existed at all points before the probable cause hearing.

medical certainty, but concluded, based upon his being left home alone, that Thor's case was "definitively a case of neglect." (DPFF ¶ 24).

After removing Thor, Wagner placed him in the foster home of Melinda Kasch. (DPFF ¶ 16). On March 27, 2009, Ms. Kasch told Wagner she could no longer care for Thor. (DPFF ¶ 30). That same day, arrangements were made for Becky Collins ("Collins"), one of Thor's former teachers, to apply for a foster care license and assume his care; Thor was moved into Collins' care that day. (DPFF ¶ 31). Collins had in fact taken Thor to a movie with his parents' permission in the past. (DPFF ¶ 31).

On May 4, 2009, Collins contacted Wagner and informed him that Thor had been injured. (DPFF ¶ 33). According to Wagner's case notes, Collins told him that Thor had released the brake on his wheelchair, rolled into the street, and fell over in his chair. (DPFF ¶ 33). As a result, Collins took Thor to the emergency room where he received three stitches near his right eye. (DPFF ¶ 33). Thor also suffered minor bruising. (Sosnay Decl. Ex. C, at 16) (Docket #35-3). On May 5, 2009, Wagner went to Collins' home to inquire about the accident. (DPFF ¶ 35). According to Collins, she had been cutting the grass and positioned Thor in the driveway facing the garage. (DPFF ¶ 35). She told Wagner that her husband was also in the driveway getting ready to go golfing. (DPFF ¶ 35). Collins stated that her husband went inside for a short period and when he returned, Thor had rolled down into the drainage system at the end of the driveway, in which there was a metal pipe. (DPFF ¶ 35) (Sosnay Decl. Ex. C, at 14). In their response to the defendants' proposed facts, the Xiongs dispute only whether Thor released the wheelchair brake on his own, or whether it was never set in the first

place. They offer no evidentiary support for this, however, arguing only that the Collinses were the only witnesses when Thor was injured.

Previously, Collins had informed Wagner that because of the difficulty in caring for Thor, she would like to end his placement with her by June 3, 2009, which would see Thor through the school year. (Shaw Aff. Ex. S) (Docket #31-5). Cindy and Jeb Lucht agreed to foster Thor after Collins, but indicated they needed additional equipment prior to taking him. (DPFF ¶ 39). As a result, Wagner temporarily placed Thor in Lakeview Specialty Hospital & Rehab ("Lakeview") in Waterford, Wisconsin. (DPFF ¶ 39). Thor was transferred to Lakeview on June 1, 2009. (DPFF ¶ 40). On June 19, 2009, after the Xiongs' attorney informed him, Wagner contacted Thor's case manager at Lakeview, Sue Weller ("Weller"), to inquire about an incident involving Thor falling from his bed. (DPFF ¶ 42). Weller responded that she was unaware of any accidents, but would check the logs. (DPFF ¶ 43). Weller also noted that when Thor first arrived he had been placed in a bed that did not lower all the way to the floor and that Thor "got out to the floor." (DPFF ¶ 43); (Sosnay Decl. Ex. C, at 4). She also indicated that mats had been placed on the floor prior to him getting out in order to prevent him from getting hurt. (Sosnay Decl. Ex. C, at 4).[6] After checking the logs, Weller contacted Wagner on July 6, 2009, and informed him that Thor had indeed fallen from his bed on June 1, 2009, and hit his head. (DPFF ¶ 44). Staff

---

[6]As is common by this point, the Xiongs dispute too whether the mats were placed on the floor prior to Thor's "getting out" of bed. Despite once more offering no evidence to support their "dispute," the case notes (here a direct copy of the email from Weller) clearly read such that the mats were placed prior to this event. (Sosnay Decl. Ex. C, at 4) ("I know the first night he had trouble sleeping as he was given a hospital bed that didn't lower all the way to the floor and he got out to the floor. We had mats on the floor to prevent him getting hurt.").

responded, assessed Thor, and applied ice for a bump on the head. (DPFF ¶ 44). The staff performed neurological checks on Thor the rest of the evening, and the next day, June 2, 2009, Dr. Majeed was called; he had no new orders. (DPFF ¶ 44); (Sosnay Decl. Ex. C, at 3). Weller also noted two other days on which Thor "flipped, slipped and rolled himself out of bed," but with no injury. (DPFF ¶ 44). Lakeview's actual logs indicate that Thor was also "placed back into his bed two times" on a third day. (Shaw Decl. Ex. E) (Docket #43).[7] That log does not indicate that Thor suffered any injury either. (Shaw Decl. Ex. E). On August 7, 2009, Thor was transferred from Lakeview to the Lucht's foster home. (DPFF ¶ 47).

Prior to 2009, Wagner and the Xiongs had previous contact related to Thor. Wagner was also involved in the Xiongs' 2005 voluntary petition to the state seeking protective services for Thor. (Pl.'s Proposed Findings of Fact [hereinafter PPFF] ¶ 9) (Docket #37); (Marion Koller Shaw Aff. Ex. 1, at 3:25-4:4:13) (Docket #31-6). On March 22, 2005, roughly four years prior to the instant events, Wagner wrote a letter to Lia Xiong that stated, *inter alia*, "I received a message from your husband on 3/21/2005, and I could not understand anything he said." (PPFF ¶ 10). On April 6, 2005, Wagner wrote a further letter to Lia Xiong stating, *inter alia*, "I returned your message, but when I called back the person that answered the phone said I had called the wrong number. I believe the person was your mother." (PPFF ¶ 11). In an

---

[7]The Xiongs, in pointing this out, also "dispute" Weller's statement, arguing that Thor had fallen six times, rather than "just three times as Weller implied." Weller in fact noted two additional *days* (three total) in which Thor had in some fashion gotten himself out of bed, but never indicated how many total times he had fallen. (Sosnay Decl. Ex. C, at 3). She only omitted the day on which Thor was "placed back into his bed" twice.

April 18, 2005 case note, Wagner wrote that he spoke by phone with Janet Ovel ("Ovel") at Family Support Service advising her of the Xiongs' situation; Ovel told Wagner they would provide necessary service and "if there is a problem with the parents following through she will notify [RCHSD]." (Shaw Aff. Ex. L) (Docket #31-5); (*see also* Marion Koller Shaw Aff. Ex. 1, at 11:23-12:15). The note continues, "[b]oth [Wagner and Ovel] feel the family attempting to manipulate system via communication between [RCHSD] and [Family Support]." (Shaw Aff. Ex. L).

2.      Discussion

The Xiongs allege five deprivations of their civil rights under 42 U.S.C. § 1983, which makes such deprivations actionable. They allege violation of Thor's Fourth Amendment right to be free from unreasonable seizure,[8] the Xiongs' Fourteenth Amendment due process right to familial relations, Thor's Fourteenth Amendment right to bodily security and integrity, all plaintiffs' Fourteenth Amendment rights to equal protection, and that the defendants conspired to deprive the plaintiffs of their equal protection rights. The plaintiffs have moved for summary judgment only on the claims regarding the Xiongs' and Thor's right to familial relations and Thor's right to bodily security and integrity. The defendants have moved for judgment as to all claims. Because the defendants are entitled to qualified immunity on most claims, and the Xiongs fail to offer sufficient evidence to establish a genuine dispute on the others, the court will grant judgment to the defendants on all claims.

---

[8]Defendants point out, and plaintiffs later implicitly agree, that Thor's claim, though pled under the Fourteenth Amendment, is properly analyzed under the Fourth Amendment.

By statute, any person who "under color of law" deprives a citizen of the United States of any right secured by the Constitution may be held civilly liable to the injured party. 42 U.S.C. § 1983. However, qualified immunity protects government actors from liability "where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). A court considers both: "(1) whether the plaintiff's allegations show that the defendant violated a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's conduct." *Id.* Either prong may be analyzed first. *Id.* A right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right." *Id.* at 473-74. Thus, in analyzing the second prong of immunity, the court looks not to satisfaction of the underlying rule, but rather to whether a reasonable official in the same position *could have believed* they satisfied the underlying rule. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (stating officials would be immune if "a reasonable officer could have believed [Bryant's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed"); *see also Hernandez*, 657 F.3d at 475 (stating standard as whether a reasonable social worker could have believed removal of child from home to be lawful). The touchstone is the reasonableness of the action, not whether it was ultimately correct. *Hunter*, 502 U.S. at 228-29 (stating agents would be entitled to immunity because decision was reasonable, even if it had ultimately been mistaken). The determination of such reasonableness, and thus immunity, is normally for the court, not the jury. *Id.* at 228. With these rules in mind, the court proceeds to discuss each claim in turn.

2.1    Thor's Seizure

The court holds that, regardless of whether probable cause in fact existed, all defendants are, or would be,[9] protected by qualified immunity. The Fourth Amendment prohibition on unreasonable seizures applies to the removal of children from a home by child welfare workers.  *See Hernandez*, 657 F.3d at 474.  "[A] seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy.'"  *Id.*  Probable cause, in the child welfare context, asks whether a prudent caseworker, with the information known at the time of action, could have believed the child "faced an immediate threat of abuse based on those facts."  *Id.* at 475.  "[S]ubjective beliefs are largely irrelevant to the probable cause inquiry."  *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011).

The cross-section of the qualified immunity analysis with the probable cause standard required to effect a lawful protective removal of a child from his or her home requires the court to examine whether a reasonable RCHSD caseworker could have believed probable cause existed to remove Thor, regardless of whether probable cause did in fact exist.  Despite the protestations of the Xiongs as to the accuracy of statements made regarding Thor's treatment at home, given the information that was relayed to Wagner, a reasonable caseworker certainly could have believed that he was in threat of immediate abuse or neglect.  Both Thor and his siblings told Wagner

---

[9]There is an issue as to whether certain defendants could even be held liable if qualified immunity did not apply.  Because qualified immunity would apply in the event of any actual violation, the court will not address the merits as to each defendant.

corroborative stories about Thor—a disabled child that cannot care for himself—being left home alone without supervision multiple times. In fact, the Xiongs' statements corroborated this. The children also described physical abuse of Thor that made it appear regular and, therefore, an ongoing and immediate threat.

The Xiongs make a series of arguments that never address the standard in question. Variously, they argue that the removal of Thor was itself unreasonable, but that question turns on whether probable cause existed. The scope of inquiry, however, is only into whether a reasonable caseworker *could have believed* that probable cause existed. The court has concluded that was the case. The Xiongs also argue that no imminent danger existed to justify removing Thor from the home. To the extent this argument is aimed at the exigent circumstances justification for removal, the court has not relied on that standard. To the extent it is aimed at the "immediate threat of abuse" standard within probable cause, the court has already found a reasonable caseworker could have believed an immediate threat existed. The Xiongs argue that, though Thor had been left home on Lia Xiong's birthday, no injuries had occurred, and that, at the time of removal, Thor's family was at home. For one, a lack of injury on one occasion does not show a lack of threat.[10] For another, the then-current presence of Thor's family does not dissipate the threat of him being left home alone later, considering that it had occurred in the past. Moreover, the Xiongs do not address the threat of physical abuse.

---

[10]That would be like arguing that a child's failure to set a house on fire when given matches in the past means that leaving matches out for a child to play with is never an immediate threat of fire.

The Xiongs also argue that the defendants could have secured an *ex parte* order to remove Thor. But that was not required. As the Xiong's cite themselves, probable cause or exigent circumstances may also justify removal when there is no warrant. The Xiongs also complain that no effort was made to place Thor with other nearby family members, but that is irrelevant in assessing whether a reasonable caseworker could have believed probable cause existed for removal. It is similarly irrelevant that a state judge may have found that the RCHSD failed to make reasonable effort to prevent removal, (Sosnay Decl. Ex. F, at 1, 5) (Docket #35-15), and did find on the record that the RCHSD failed to make reasonable effort to return Thor to his home (Shaw Aff. Ex. D, at 50). The actual finding of reasonable efforts after the fact does not bear upon whether, at the time, a reasonable caseworker *could have believed* probable cause existed for removal, and a failure to make reasonable effort to return Thor has absolutely no connection to the original removal decision.

Finally, the Xiongs attempt to distinguish *Hernandez* by painting the standard for qualified immunity as one in which the official must be confused in the face of a complex law. That is not the standard. The standard is whether a person could have reasonably believed probable cause existed. Confusion of the type argued by the Xiongs may bear on such an inquiry, but it is not required. The Xiongs also take issue with the fact that *Hernandez* did not refer to neglect, but rather only abuse. But if neglect is sufficient for removal, then probable cause applies equally. In fact, the portion of *Hernandez* cited by the Xiongs for the proposition that neglect is not a sufficient reason for removal is an incorrect reading. The court wrote that the *general* danger of future neglect is insufficient; rather, the danger

must be imminent. 657 F.3d at 486. The court has so found. And in any event, the evidence of potential abuse as well was sufficient to support a reasonable belief that probable cause for removal existed. The Xiongs also make various arguments as to racial animus being the actual motivation behind the removal decision, but probable cause, and thus the overlying qualified immunity analysis, is an objective test.

As such, on the basis of the bruises, the statements made by Thor and his siblings, and even some confirmation by the Xiongs themselves, the court finds that a reasonable caseworker could have believed that probable cause existed to remove Thor as of March 24, 2009. Nothing suggests that the defendants should have reasonably known their conduct violated Thor's Fourth Amendment rights. Therefore, the defendants, to the extent they could be otherwise held liable, are shielded by qualified immunity on this claim.

2.2     Right to Familial Relations and Continued Withholding

Similarly, the defendants, to the extent they would otherwise be liable, are shielded by qualified immunity from liability for the alleged violation of the Fourteenth Amendment right to familial integrity. The Fourteenth Amendment's conception of liberty includes the right to associate with relatives. *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir. 1989). Thus, substantive due process includes the right to familial relations. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). Balanced as that right is against the interest of the state in protecting children, removal satisfies substantive due process only where the state "has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1019. Reasonable suspicion "requires

more than a hunch but less than probable cause." *Hernandez*, 657 F.3d at 478. Here, the cross-section of qualified immunity and substantive due process in this context requires the court to determine whether a reasonable caseworker could have held a reasonable suspicion of abuse or believed imminent danger of abuse existed. As this standard is less than that of probable cause, and having already found qualified immunity on that standard, the same conclusion applies here.

However, in the case of continued withholding of a minor, where probable cause or reasonable suspicion dissipate, continued withholding becomes a constitutional violation. *Id.* at 480. Thus, the qualified immunity analysis is likewise interested in whether a reasonable caseworker would have understood that probable cause or reasonable suspicion had dissipated, making their actions a constitutional violation. *Id.* Because a state judge issued a probable cause order validating Thor's temporary removal, the analysis focuses on the time between initial removal and the court order authorizing removal. In light of the Xiongs' post-removal statements as to leaving Thor home alone, as well as the medical report concluding Thor's was a case of neglect, the court concludes a reasonable caseworker could have believed that probable cause or reasonable suspicion continued to exist after Thor's removal and prior to the probable cause hearing. None of these subsequent events would have dissipated any reasonably held belief that probable cause to remove Thor existed. The defendants are entitled to qualified immunity.

### 2.3    Right to Bodily Security and Integrity

Similarly, qualified immunity shields the defendants from liability for any potential violation of Thor's right to bodily security and integrity. Here,

the plaintiffs' primary argument relates to whether Thor's right was violated at various times because of his placement in particular foster homes. However, they also raise a claim for the first time on summary judgment regarding the scope of Wagner's physical examination of Thor prior to his removal.

### 2.3.1   Foster Placements

The Fourteenth Amendment does not ordinarily require the state to protect an individual from private injury; however, a duty arises where the state creates or substantially contributes to creation of circumstances rendering an individual more vulnerable to danger. *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). This may occur where the state has a "special relationship" with the individual, or where it affirmatively places the individual in a position of danger. *Id.* Thus, in the context of foster care, "a child has a constitutional right to be placed into a safe and secure foster home." *Id.* The measure of satisfaction is a modified deliberate indifference standard. *Id.* at 666. The state violates this right only where it has "actual knowledge or suspicion of the risk of harm the child may suffer while in foster care." *Id.* at 666-67. More specifically, the state is "liable only if [it] violated 'the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian…*whom the state knows or suspects to be a child abuser*.'" *Id.* at 665 (quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990)) (emphasis in original).

At issue here are the injuries allegedly suffered at two separate foster-care placements after Thor's removal from the Xiongs' household: with Collins and with Lakeview. Nothing about the solitary incident with Collins, even giving credence to the Xiongs' unsupported assertion that Collins may

never have set Thor's wheelchair brakes at all, is enough that a reasonable caseworker would have gained knowledge or suspicion of a risk of harm from Thor's continued placement with Collins. The Fourteenth Amendment protects only from abuse or neglect. It does not contemplate protection from accidents; if it did, no state foster placement would ever satisfy the Constitution; children, simply put, are prone to accident. Even if Collins had not set Thor's wheelchair brake, the Xiongs point to no evidence to establish it was purposefully done with the intent to harm Thor or with such disregard as to rise to the level of abuse or neglect. Without any such showing, the court simply cannot conclude that a reasonable caseworker would have developed a suspicion that Collins was abusing or neglecting Thor, or would abuse or neglect him, and that continuing his placement with her would violate Thor's right to bodily security and integrity.

As to Thor's placement at Lakeview, again, none of the facts viewed in the light most favorable to the plaintiffs establish that a reasonable caseworker would have known or suspected that Lakeview abused or neglected children.[11] Wagner received one report from the Xiongs' attorney that Thor had fallen out of bed and injured himself. No one ever alleged his injury was the result of abuse or neglect. After inquiring with Lakeview, the evidence appeared to substantiate that Thor's injuries were not caused purposefully by Lakeview staff, unless everyone involved in Thor's care was orchestrating a coverup. Under these facts, a reasonable caseworker could

---

[11]The Xiongs state that "Lakeview had previously been investigated by RCHSD," as if to imply that the department suspected it of child abuse or neglect, but that fact is supported only by Leydel's statement that the department does investigate foster homes and that Lakeview had been investigated "when warranted." (Marion Koller Shaw Aff. Ex. 3, at 113:21-23) (Docket #31-6).

have believed that leaving Thor at Lakeview was not a violation of his right to bodily security and integrity. In other words, a reasonable caseworker could be confronted with these facts without developing a suspicion that Thor was being abused or neglected.

The Xiongs make a series of arguments that are often immaterial to the analysis at hand, and ultimately express the belief that Thor's foster placements were at least as potentially dangerous as the situation from which he was removed at the Xiongs' household. Presumably, this argument implies that if such was the case, the defendants should likewise have known or suspected that Collins and Lakeview were child abusers. That argument simply ignores the fact that the initial removal was based upon referrals indicating active physical abuse and neglect, whereas the incidents at Collins' foster home and Lakeview establish little more than the mere possibility that Thor could have been abused or neglected, assuming everyone involved was lying. This possibility was further set off by the knowledge that Thor is difficult and has been known to hit himself. In sum, a reasonable caseworker could have believed Thor's placements with Collins and Lakeview were not violative of his right to bodily security and integrity and, therefore, the defendants are shielded by qualified immunity.

### 2.3.2 Examination of Thor's Bruising

The Xiongs also challenge Wagner's examination of Thor's pubic area when investigating the bruises to his arm and leg/hip. They argue that this too violated Thor's right to bodily security and integrity. Notice pleading requires a complaint to "fairly notif[y] a defendant of matters sought to be litigated." *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 679 (7th Cir. 2005). Thus, it is well settled that the failure to plead a claim and to raise it for the

first time on summary judgment constitutes a waiver. *Abuelyaman v. Ill. State Univ.*, No. 10-2926, 2011 WL 6188446, at *11 (7th Cir. Dec. 13, 2011) (upholding district court's rejection of new, fourth theory of discrimination presented only in opposition to summary judgment); *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1314 n.11 (7th Cir. 1987) (upholding exclusion of claim raised for first time in opposition to summary judgment because "Plaintiffs' complaint did not give fair warning of the theory"). The Xiongs made no mention of this theory of Fourteenth Amendment violation at any point prior to summary judgment, thereby depriving the defendants of fair notice. While the Xiongs were not required to lay out every specific fact and legal theory, the gravamen of both the complaint and amended complaint clearly indicated only that Thor's right to bodily security and integrity was violated through his various foster placements after removal. (*See, e.g.*, *Am. Compl.* ¶ 147) (Docket #10) ("Thor, while in foster care, was deprived of his substantive due process right to personal security and bodily integrity"). To hold that the amended complaint gave sufficient notice of a claim that Wagner exceeded the scope of permissible examination, would be to hold that merely alleging the violation of the Fourteenth Amendment gives sufficient notice to a defendant of any possible violation conceivable under the amendment. Even if the facts regarding examination were not learned until after the amended complaint, the Xiongs made no further attempt to

amend after commencing discovery. Thus, the court finds this theory of violation waived and will not consider the merits.[12]

### 2.4 All Plaintiffs' Rights to Equal Protection

Next, because the plaintiffs fail to offer sufficient evidence to establish the existence of any racial animus, the defendants are also entitled to judgment on the equal protection claim. To show violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff "must establish that a state actor has treated him differently from persons of a different race and that the actor did so purposefully." *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 812 (7th Cir. 2001).

Aside from the two letters and one case note from 2005, four years prior to the removal events, the Xiongs otherwise rely on the earlier-recited 2009 facts to establish that Wagner held a racial animus against them because of their Hmong ancestry, and that he treated the Xiongs disparately from people of other races. The Xiongs' argument thus appears to boil down to: (1) Wagner was racially biased against the Xiongs; and (2a) Wagner acted on this bias by violating the Xiongs' and Thor's Fourth and Fourteenth Amendment rights already discussed above; or (2b) Wagner acted on this bias by failing to take protective actions against Collins or Lakeview, thus treating the plaintiffs disparately. First, even viewing the facts in the light most favorable to the Xiongs, that is, drawing all *reasonable* inferences in their favor, a reasonable jury could not find that Wagner held any racial animus

---

[12]Even so, the court notes that the Xiongs provide only the barest legal precedent to support the argument that Wagner committed a violation during his examination and photographing, and the court would likely agree with the defendants that the cited cases do not in fact support the argument under the circumstances here.

toward the Xiongs or Thor. Other than counsel's hyperbolic story concocted from the basis of two four-year-old letters and a case note, no reasonable juror could view Wagner's 2005 statements as indicating an "overtly rude" and "racist attitude" on Wagner's part. While inferences are certainly a permissible way to establish such a bias, such an inference here would simply be unreasonable.

As to the actions of Wagner throughout the removal and foster placement, neither could a reasonable juror draw the inference of bias from those events without more. For one, the court has found that a reasonable caseworker could have believed that his or her actions in removing and placing Thor in foster care did not violate either the Xiongs' or Thor's constitutional rights. That conclusion alone forecloses a genuine dispute as to racial animus. It would be unreasonable to infer unconstitutional motive solely from activities that a reasonable person could have believed were constitutional. The other possibility of showing a dispute as to Wagner's alleged animus is that he took the (otherwise reasonably-believed-to-be constitutional) action against the Xiongs while failing to take the same action against Collins or Lakeview. However, that would require the circumstances between the Xiongs and Collins and Lakeview to be reasonably comparable. They are not. As discussed earlier, Wagner acted to remove Thor upon direct referrals indicating abuse and neglect, and corroboration from children—including Thor—living in the Xiong household, as well as the Xiongs' statements. The facts surrounding Thor's injuries at Collins' home and at Lakeview involved only the possible inference of abuse if one presumed that everyone involved was lying. There were no direct referrals or corroborations sufficient to establish the same belief that abuse or neglect

would occur as did for the Xiongs.  The situations are not comparable, and thus, Wagner's different actions in two distinguishable scenarios does not allow a *reasonable* inference of racial animus simply because the Xiongs are Hmong and Collins and the Lakeview employees are not.[13]  Alternatively, because the court already concluded that a reasonable person could have believed that leaving Thor in either location was not a violation of his right to bodily security and integrity, it would be unreasonable to infer racial animus in leaving him there while having removed him from the Xiongs' household.  Thus, despite whether the Xiongs can even establish they were in fact treated differently than (and unequally from) other citizens, they have not offered sufficient evidence to establish a dispute as to whether any such disparate treatment was done on the basis of their race.  For that reason alone, the plaintiffs' claims under the equal protection doctrine fail.

2.5     Conspiracy to Violate Constitutional Rights

Finally, because the court finds the defendants are entitled to summary judgment on the other alleged constitutional violations, they are likewise entitled to judgment on the conspiracy claim.  A party may recover damages for injury or deprivation of equal protection of the laws when committed by two or more persons conspiring with the purpose to so deprive the plaintiff.  42 U.S.C. § 1985(3).  This requires:

> (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.

---

[13]Moreover, as the defendants point out, the Xiongs offer no evidence to establish the ethnicity of the Lakeview employees caring for Thor.

*Brokaw*, 235 F.3d at 1024. The purpose element requires showing a racial, ethnic, or other class-based "invidiously discriminatory animus" behind the action. *Id.* Because conspiracy requires an invidious class-based purpose of depriving a person of equal protection, and because the Xiongs offered insufficient evidence to support such a purpose, i.e., they cannot establish a racial animus, the conspiracy claim necessarily falls along with the equal protection claim. Thus, the court will grant the defendants judgment on this claim as well.

Accordingly,

IT IS ORDERED that the plaintiffs' Motion for Partial Summary Judgment (Docket #31) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' Motion for Summary Judgment (Docket #32) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of February, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge